901 So.2d 638 (2004)
Juliet Lawson JOWETT, individually and for and on behalf of Scruggs, Millette Lawson, Bozeman & Dent, P.A and Scruggs, Millette, Bozeman and Dent, P.A., Appellants
v.
Richard F. SCRUGGS; Richard F. Scruggs, P.A.; Scruggs, Millette, Bozeman & Dent, P.A.; Asbestos Group, P.A. and Occupational Hearing Loss, P.A., Appellees.
No. 2002-CA-00039-COA.
Court of Appeals of Mississippi.
August 3, 2004.
Rehearing Denied February 8, 2005.
Certiorari Denied May 19, 2005.
*639 Juliet Lawson Jowett, Ocean Springs, attorney for appellants.
William N. Reed, Jackson, attorney for appellees.
Before SOUTHWICK, P.J., IRVING and GRIFFIS, JJ.
SOUTHWICK, P.J., for the Court.
¶ 1. Juliet Lawson Jowett was a shareholder in a law firm. She was terminated as an employee, but in this litigation has argued that she has never been validly expelled as a shareholder. The lower court awarded her about $420,000 for undistributed taxable income and for the value of her shares. On appeal, Jowett argues that the chancellor incorrectly determined the date that she ceased to be a shareholder, incorrectly determined the value of her shares, erred in finding no breach of fiduciary duty by other firm members, and improperly denied her punitive damages and her attorney's fees. We find that she has been properly compensated. Consequently, we affirm.
¶ 2. In 1989, Juliet Lawson Jowett began working for Richard Scruggs as an employee of Asbestos Group, P.A. Jowett worked primarily in the area of occupational hearing loss. She litigated cases as a member of another of Scruggs' professional associations, Occupational Hearing Loss, P.A. In 1994, the law firm of Scruggs, Millette, Lawson, Bozeman & Dent, P.A. ("SMLBD") was formed. Jowett was the "Lawson" in this firm and owned eight percent of the shares.
¶ 3. The shareholders of the firm were paid a salary and were given a portion of net revenue based on their performance. The board of directors determined the annual bonuses of the shareholders. In 1995, Jowett signed an employment contract with SMLBD which discussed her rights as an employee of the firm and provided for a base salary of $100,000.
¶ 4. Jowett continued to work on the hearing loss litigation until she went on maternity leave in 1996. Another attorney took over the litigation at the time that Jowett began her leave. In 1997, Jowett returned to SMLBD. She and Scruggs executed a written agreement, effective on January 1, 1997, that modified the 1995 employment contract. Jowett would receive $100,000 annual salary, $110,360 cash, a possible annual bonus to be determined by the board of directors, one-third of the net fees received by SMLBD for the hearing loss cases, and $3,000 per month for rent and supplies for an Ocean Springs office.
¶ 5. Jowett opened an office in Ocean Springs under the name of Juliet Jowett, P.A. All advertisements and contracts with clients were done under this name and not SMLBD. Jowett kept all fees from this firm and did no further work for SMLBD. However, she continued to receive the contracted-for salary from SMLBD along with the $3,000 per month for expenses. On February 13, 1998, Scruggs sent Jowett a letter advising her that she would be terminated sixty days from the date of the *640 letter. Her termination was ratified by the firm on October 14, 1999.
¶ 6. During the period of Jowett's work with Scruggs, litigation on behalf of the State against major tobacco companies was brought. See In re Fordice, 691 So.2d 429, 430-31 (Miss.1997) (only reported decision on this tobacco litigation; that appeal contested but the Court did not resolve the authority of the state's attorney general to employ SMLBD and other private law firms). In October 1997, there was an agreement involving the amount of payments by the defendants to the plaintiff-states, but there was no agreement as to attorneys' fees. In December 1997, the settlement was approved with a provision for arbitration to determine attorneys' fees. In July 1998, the law firm, now Scruggs, Millette, Bozeman & Dent, P.A., received its first advance fee payment.
¶ 7. On February 26, 1998, Jowett filed suit against Scruggs and the firm in federal court on the basis of sex discrimination and other employment claims. This case was eventually dismissed with prejudice. On January 12, 1999, Jowett filed this complaint with the Chancery Court of Jackson County. In two phases of trial, the judge found that Jowett was entitled to $184,156 for income that was not distributed to her, taxable for the year 1997. He also found that the values of her shares of stock was $234,053.84. Dissatisfied with these awards, Jowett appeals.

DISCUSSION
¶ 8. Jowett divides her appellate arguments into fourteen issues. We find the division to be somewhat unwieldy in analyzing what is before us. The following is our path to a conclusion: (1) was Jowett properly expelled as a shareholder; (2) if so, what is the date to value her shares; (3) what was the value of her shareholder interest on that date; (4) was there a breach of fiduciary duty owed by Scruggs or others to Jowett; (5) should punitive damages and her attorney's fees be awarded?

1. Jowett's expulsion as a shareholder

a. Employment contract as legal basis for expulsion
¶ 9. During the first phase of the trial, the chancellor found that Jowett's shares in SMLBD should be valued as of April 14, 1998. This was sixty days from the date of the termination letter that Scruggs sent to her. The letter stated that she would be terminated after that time lapse.
¶ 10. The chancellor noted his belief that Jowett actually ceased being a shareholder the date that she opened her firm, Juliet Jowett, P.A., which was in April 1997. He reasoned that she could not be a shareholder in more than one professional corporation under the Mississippi Rules of Professional Conduct and the Professional Corporations Act. He found that she was a "passive shareholder" in SMLBD from the time she opened her own firm until April 1998. The chancellor ultimately did not value Jowett's shares as of the 1997 date that she started a new firm, but instead as of April 14, 1998, when her termination from SMLBD became effective.
¶ 11. Some states have professional rules explicitly prohibiting attorneys from participating in more than one association. See Petition of New Hampshire Bar Ass'n, 110 N.H. 356, 266 A.2d 853 (1970). Mississippi has no such rule. We agree that there may be questions of loyalty and confidences that become more difficult when a professional belongs to more than one association. Yet we find no definite prohibition in Mississippi for an attorney to be a member of multiple legal associations. Since the Supreme Court has sole appellate court authority over the rules of *641 professional discipline, we are disinclined to resolve this appeal on this ground if there is an alternative basis on which to rule. There is, as we will discuss below.
¶ 12. Prior to bringing the present suit, Jowett had filed suit in federal court against Scruggs and other defendants. That suit was dismissed with prejudice. For our purposes, the primary importance of that earlier litigation is that the federal court found that the January 1997 employment agreement between Jowett and the firm was valid and enforceable. The federal suit ended and no appeal was taken. Therefore, the present litigation cannot again challenge the validity of the 1997 employment contract. Williams v. Vintage Petroleum, Inc., 825 So.2d 685, 688 (Miss.Ct.App.2002). The chancellor properly relied on res judicata to find the employment contract valid.
¶ 13. The employment contract stated that its purpose was to define the relationship between SMLBD as an employer and Jowett as an employee. By signing the agreement, Jowett accepted employment under the conditions of the contract. The final paragraph of section 11 of the contract, that section's being entitled "Termination of Employment," provides for valuing the "shares or other entitlements" of the employee. In addition, occasionally Jowett is referred to as "shareholder," though the opening provision of the contract states that the shorthand reference to her will be as "employee." These cursory allusions to shareholder status in an employment contract at least provide some basis for the belief, adopted by the chancellor, that the 1997 contract was creating a new relationship between the firm and Jowett in contemplation of her permanent departure.
¶ 14. Jowett argues that she was improperly terminated, and regardless, that she was never expelled as a shareholder. On the first point, Jowett alleges that her termination was not within the language of the contract. She argues that she was not a disqualified shareholder as the chancellor found nor was she terminated "for cause." Jowett argues that under these circumstances, she is still a shareholder. To consider this question, we examine the 1997 employment contract. Section 11 is entitled "Termination of Employment." Section 11.01 has these reasons for termination:
(a) conviction or entry of a plea of guilty... of any crime or offense involving money or other property of the Corporation or any felony or other offense involving moral turpitude
(b) violation of written direction to the Corporation's Board of Directors
(c) The habitual use ... of alcohol or drugs
(d) Legal disqualification from the practice of law; or
(e) Dishonesty or gross negligence
¶ 15. The later Section 11.05 of the contract contains the following language, which must be read in light of the opening line of section 11 which is that "This Agreement shall be terminated:"
Notwithstanding any of the provisions of subparagraphs (a) through (c) above, upon sixty (60) days prior written notice by either Employer or Employee to the other. Employer may elect to relieve employee of all duties and rights to enter Employer's premises upon delivery of notice hereunder.
Section 11.05 therefore provides that the giving of sixty days notice of termination is effective even without the grounds set out in section 11.01. The reference to "subparagraphs (a) through (c)" is ambiguous, perhaps a vestige of earlier versions of the agreement.
*642 ¶ 16. Section 11 concludes with the method of measuring the terminated employee's benefits:
Upon termination for any of the foregoing causes, the Employee shall be entitled to receive (1) the amount of annual salary accrued but unpaid as of the date of termination ... (2) compensation, based on his/her annual salary for all unused leave time.... In determining the value of Employer's shares or other entitlements, it is agreed that cases and matters in process shall be given no value in excess of net fees actually collected by the Employer net of expenses at the time of termination.
¶ 17. Jowett was not dismissed for any of the reasons listed in 11.01. However, the trial judge found that she was properly terminated under section 11.05 after receiving a sixty day notice of termination. He also concluded that this just-quoted concluding paragraph to Section 11 applies not just to terminations "for cause," but to terminations for any reason. That was a valid analysis.
¶ 18. This concluding part of Section 11 implies that Jowett would no longer be entitled to own SMLBD shares if she were terminated, since there is a provision for setting a value on her shares. It makes sense for Jowett to relinquish stock in a professional association in which she is no longer practicing, but the issue before us is whether the necessary steps were taken to end Jowett's rights as a shareholder. This contract was superimposed on her rights as a shareholder.
¶ 19. There are parallel questions of Jowett's rights under an employment agreement and her rights as a shareholder. When she no longer was an employee may, or may not, be the same as when she stopped being a shareholder. The employment agreement was found to be ambiguous. Based on evidence of the discussions between Scruggs and Jowett, and on Jowett's intent as related in contemporaneous explanations to other people about her negotiations, the chancellor found that the January 1997 "agreement was intended to sever all ties between Jowett and SMLBD" except for what was necessary to set a value on her shares. There is evidence on which the chancellor could rely to that effect. We uphold that finding as a reasonable manner of resolving disputed facts. Whether such an interpretation is legally sustainable or whether it is overridden by the controlling documents and statutes regarding the professional corporation will be discussed next.

b. Professional corporation provisions as to ending shareholder status
¶ 20. Among the difficulties in the case is that a professional corporation is something of a hybrid creature. Historically, professionals such as lawyers were not allowed to operate in a corporate structure. That began to change in the 1960s, with federal income tax laws' being the primary motivation for a change. ROBERT W. HILLMAN, LAW FIRM BREAKUPS, § 5.1 (1990), at 114. The adoption of the corporate model did not necessarily alter the manner in which attorneys conducted their business affairs. A legal partnership technically dissolves whenever a partner leaves, and may be immediately formed again with the remaining partners. Id., § 4.2.1 at 62-63. On the other hand, a professional corporation like other corporations has the right to continue despite a change in stockholders. Among the variations from state to state, statute to statute, and precedent to precedent, is whether a shareholder must have a present employment relationship with the firm in which the attorney owns stock. Id., § 5.5.1, at 130 n.5.
*643 ¶ 21. One of the grounds on which the chancellor relied was that the employment contract caused Jowett to no longer to be a stockholder when she was terminated as an employee. The chancellor concluded that the employment agreement made Jowett a disqualified person when she started her own firm and when she was terminated from SMLBD. Section 11.01(d) of the employment contract provides that if Jowett became disqualified to practice law, she would be terminated as an employee. The employment contract does not define disqualification beyond referring to "legal disqualification." A disqualified person is an individual who becomes ineligible to be issued shares of stock by a professional organization for any reason set out in Sections 79-10-1 through XX-XX-XXX of the Professional Corporations Act. Miss.Code Ann. § 79-10-5(a) (Rev.2001). Generally, a person holding a license to practice law in the state is eligible to be issued such shares. Miss.Code Ann. § 79-10-31(1)(a) (Rev.2001). Jowett retained her license. The firm argued and the chancellor found that Jowett's termination as an employee ended her shareholder status. We look more closely at the relevant statutes and the corporate documents of this firm to determine if that is correct.
¶ 22. The Mississippi Professional Corporation Act compels the acquisition by the corporation of the shares of any disqualified shareholder. Miss.Code Ann. § 79-10-37 (Rev.2001). Nothing in the Act directly requires a lawyer to be engaged in the practice of law for the corporation in order to own shares. The Act certainly contemplates that shareholders will be so engaged, as when Article 4 of the Act discusses both the voting of shares and the confidences and privileges applicable to employees of professional corporations. Miss.Code Ann. §§ 79-10-61 through 79-10-67 (Rev.2001). Still, not all such professionals would need to be shareholders, and perhaps not all shareholders would need to be employed at the firm.
¶ 23. There is also no statutory language empowering the corporation to expel shareholders. See Miss.Code Ann. § 79-10-15 (Rev.2001) (powers of professional corporation, which adopts the general corporate powers of section 79-4-3.02 (Rev.2001)). Included as a general corporate power is authority to adopt bylaws. Miss.Code Ann. § 79-4-3.02(3) (Rev.2001). We turn to SMLBD's bylaws to determine if they provide for expelling a shareholder.
¶ 24. Section 4 of Article VI of the bylaws describes the process for redemption, cancellation or termination of shares of stock held by deceased, retired, disqualified or expelled shareholders. In this way, the bylaws certainly contemplate expulsion, but nothing in them structures shareholder expulsion. Jowett's employment contract had a provision on how she could be expelled as an employee. The last paragraph of section 11 of the contract, already quoted, stated that upon termination, the issues of share value would be addressed in a certain way.
¶ 25. Having identified the bylaws and professional corporation statutes as the relevant sources, we acknowledge that there is little in those materials that establishes a right to expel a shareholder. What we find is a failure of either the Professional Corporation Act or SMLBD's bylaws to state explicitly whether a shareholder may continue to own stock once that person is no longer performing legal work for the association. As we have noted already, different states have interpreted their professional corporation statutes in different ways on this point. Jowett also points out that SMLBD ignored most corporate law formalities, including the holding of meetings.
*644 ¶ 26. There is one final consideration, though. The 1997 employment agreement, found to be valid and enforceable in the earlier federal litigation, at least implies that upon termination as an employee Jowett would have to relinquish her shares of stock. When this special contract for Jowett was negotiatedperhaps as an intermediate step to deal with the growing difficulties that the firm and Jowett were encounteringher rights as a shareholder were also affected. Therefore, when the chancellor found that the evidence of the negotiations and the conduct of the parties filled in the gaps on the ambiguous contract, he was finding that this was a separate and enforceable agreement to require the relinquishment of shares upon termination.
¶ 27. Statutory support for a contract that requires the transfer of shares appears in the same section that requires a professional corporation to reacquire the shares of a deceased or disqualified shareholder: "A provision for the acquisition of shares contained in a professional corporation's articles of incorporation or bylaws, or in a private agreement, is specifically enforceable." Miss.Code Ann. § 79-10-37(5) (Rev.2001). Though subsection (1) of that statute is written in terms of when a corporation must reacquire shares, we do not find any limitation in the just-quoted subsection (5) to situations of legal disqualification or death.
¶ 28. One final issue of authority exists. The decision to terminate Jowett was made by Scruggs as president and director. It was not until October 1999 that a meeting of shareholders and the director ratified this action. Under the bylaws, the president could perform "all duties incident to the office of president," which we find included terminating employees. The later ratification of this action by the shareholders and director of SMLBD related back to the date of the Scruggs letter and removed any possible defect from the president's acting alone. 2A FLETCHER CYCLOPEDIA OF LAW OF PRIVATE CORP. § 782 (2003), at 524-26. The more general failure to hold annual meetings does not invalidate corporate action. Miss.Code Ann. § 79-4-7.01 (Rev.2001), made applicable to professional corporations by Miss.Code Ann. § 79-10-3 (Rev.2001).
¶ 29. Nothing in the statutes or bylaws prevents the corporation from requiring that Jowett no longer own stock once she is no longer working for the firm. The contract making these special rules is valid at least under principles of res judicata. When Jowett was terminated as an employee, SMLBD could enforce its contract that required Jowett to relinquish her shares.

2. Date of valuing shares.
¶ 30. We have determined in the previous section that Jowett's termination as an employee effectively expelled her as a shareholder. Under section 11.05 of the employment contract, Jowett would have no right after termination to share in fees that were not yet collected on the date of her termination: in valuing her shares, "cases and matters in process shall be given no value in excess of net fees actually collected by Employer net of expenses at the time of termination."
¶ 31. Though the employment contract provides for the date of effective termination as the end of Jowett's right to share in fees, no determination and payment of that amount then occurred. Under Article VI, Section 4 of the bylaws, Jowett's stock was within 120 days of her expulsion as a shareholder to "be either redeemed or cancelled by the corporation or transferred to a person or persons authorized to hold such shares" provided the transfer is in *645 compliance with Section 3 of Article VI of the bylaws. Section 3 states:
No shareholder of the corporation may sell or transfer his shares in the corporation except to another individual who is eligible to be a shareholder of the corporation; any sale or transfer of stock of the corporation may be made only after the same shall have been approved at a shareholders' meeting especially called for such purpose
¶ 32. The bylaws indicate that Jowett's stock did not automatically return to the corporation or otherwise lapse at the end of 120 days. However, none of the provisions creates an alternative and later date for taking the snapshot of what fees had been collected on continuing business. What the bylaws are addressing is the obligation to calculate the entitlement and then make the settlement with the shareholder, whenever the effective end of her shareholder rights might have been. Certain options exist for the corporation and shareholder, the exercise of those options to be approved at a shareholders meeting. No such meeting was held within 120 days after April 15, 1998, the date that Jowett's termination as an employee became effective.
¶ 33. The bylaws then discuss the failure to have a meeting. Section 4 also provides that "if the shares are not so redeemed or transferred within the required period of time, the corporation is authorized, to and shall cancel the shares on its books at the termination of the required period." There was no effort by the corporation to cancel Jowett's shares until a meeting in October 1999.
¶ 34. Jowett argues that the firm's inattention to corporate formalities means that her interest in the firm continued until those formalities were observed. The firm, though, argues that the language that we next quote from Section 4 of Article VI of the bylaws protects them against their inattention:
In the event valuation and payment terms are not provided under an existing agreement among the shareholders, or between the shareholders and the corporation, or are not agreed upon either prior to or at any time after the end of the required holding period, the book value of the redeemed or cancelled shares shall be determined and paid within [120] days after the required holding period.
¶ 35. Reading these sections together, we conclude that if nothing is done by the firm regarding determining the value of the stock, then after the initial 120 days in which Jowett's stock could have been redeemed or cancelled, and after the next 120 day period has elapsed, the book value of the stock will "be determined and paid." At this deadline, the firm again did not act.
¶ 36. The chancellor held that the firm's failure to make the computation at that time and pay Jowett entitled her to interest on the unpaid amount, but the calendar on her right to an interest in the firm was not continuing. The chancellor pointed out that during the period contemplated by the bylaws for making the calculations and settling with Jowett, she brought suit. The litigation allowed SMLBD to delay completion of the determination and payment.
¶ 37. The date of Jowett's effective termination, which was sixty days after the termination letter was sent her, remained the date for setting the value on Jowett's stock.

3. Valuation of Jowett's shares of stock
¶ 38. The chancellor found that through reading SMLBD's articles of incorporation, the bylaws and the 1997 employment agreement together, the valuation of *646 the shares should be their "book value." That value would exclude the value of work in process or accounts receivable. The relevant provisions that underlay this conclusion include this from the articles of incorporation:
The price for such share or shares of stock of the Corporation shall be the book value thereof as of the end of the month immediately preceding the death, disqualification, retirement, or expulsion of the shareholder. "Book value" ... shall be deemed to include the accounts receivable, but not the work in process, of the Corporation after a reasonable allowance for uncollectible accounts.
The bylaws of the corporation contain identical language concerning book value.
¶ 39. We repeat here the relevant language from the 1997 employment contract:
Upon termination for any of the foregoing causes, the Employee shall be entitled to receive (1) the amount of annual salary accrued but unpaid as of the date of termination ... (2) compensation, based on his/her annual salary for all unused leave time.... In determining the value of Employer's shares or other entitlements, it is agreed that cases and matters in process shall be given no value in excess of net fees actually collected by the Employer net of expenses at the time of termination.
¶ 40. Three witnesses testified at trial as to the value of Jowett's shares of stock on April 14, 1998. Floyd Penton, a certified public accountant, was the accountant for SMLBD. Hugh Parker, a certified public accountant, testified on behalf of the corporation. Penton prepared a document based on the financial and accounting books of SMLBD. He testified that the right to receive future income is not included in book value and that cost advances are included as an asset. He further testified that no attorneys' fees from the tobacco cases were received before April 14, 1998.
¶ 41. Monroe Wright, a certified public accountant, testified as a witness for Jowett. Wright testified that cost advances should be included as equity to calculate book value. Book value is "the paid-in capital, plus earnings that have been retained in the company as retained earnings." He relied on a report done by Mercer Capital Management, Inc., to determine the fair market value of the rights of anticipated payments for the tobacco case. Wright calculated that Jowett should have received $2,462,400 from the attorneys' fees awarded for the tobacco settlement. He arrived at this figure by calculating Jowett's share of SMLBD's eighteen percent of the $253,497,803 in attorneys' fees. Wright stated "I haven't been able to determine when any of the 253 [million dollars] was collected by Scruggs-Millette." As to accounts receivable and cost advances, he testified "the costs have been deferred as opposed to being accounts receivable. Now, that is kind of splitting hairs."
¶ 42. Parker testified that book value is net equity, defined as assets less liabilities. According to his calculation, the book value of Jowett's interest on April 14, 1998 was a negative $6,400. His calculation did not include works in progress or cost advances.
¶ 43. After the second phase of the trial, the chancellor found that there was no evidence that SMLBD received any of the tobacco settlement money before April 14, 1998. The chancellor found that the firm's accounting method stopped calculations of assets at one month prior to termination, March 1998, included classifying cost advances as assets. He then determined that the book value of the firm on that date was $3,109,828.98 and Jowett's interest as an eight percent shareholder *647 had a book value of $248,786.32. He awarded her this amount.
¶ 44. There were some interpretive difficulties in reaching these conclusions. The articles of incorporation and bylaws include accounts receivable as assets while the 1997 agreement is silent as to accounts receivable. In the pretrial order, the parties conceded that the 1997 agreement was ambiguous, so extrinsic evidence could be used to interpret the agreement. Barnett v. Getty Oil Co., 266 So.2d 581, 586 (Miss.1972). Its interpretation by the chancellor is reviewed under a manifest error standard. Lamb Const. Co. v. Town of Renova, 573 So.2d 1378, 1383 (Miss.1990). "The cardinal rule of construction is to give effect to the mutual intentions of the parties." Id. The language of the articles of incorporation control over bylaws; the corporation statute controls over the articles; other sources of law may control over the bylaws. T. Jackson Lyons, Corporations, 3 ENCY. OF MISS. LAW § 22:32 (Jeffrey Jackson & Mary Miller eds.2001).
¶ 45. The chancellor found that the 1997 employment agreement was intended to "sever all ties between Jowett and SMLBD." Jowett opened her own firm and received a salary and benefits package from SMLBD, yet did not do any work for that firm beginning in 1997. Based on the evidence, we find that the chancellor did not err when he interpreted that the value of Jowett's stock would include cost advances but would not include accounts receivable.

4. Breach of fiduciary duty
¶ 46. The chancellor found that Scruggs owed all of the shareholders a fiduciary duty of good faith and loyalty as sole officer and director of SMLBD. He found that there was no breach of this duty. A chancellor's decision finding there is no breach of fiduciary duty will be affirmed "unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." Hill v. Southeastern Floor Covering Co., Inc., 596 So.2d 874, 877 (Miss.1992).
¶ 47. Jowett argues that Scruggs violated his fiduciary duty by failing to value her shares as is required by the bylaws of the firm. SMLBD filed a share valuation petition as a counterclaim to Jowett's lawsuit within the 240 days required in the bylaws to value shares but it was dismissed with Jowett's consent. The failure to value Jowett's shares and pay her for them during the pendency of this litigation was validly found not to indicate a breach of fiduciary duty.
¶ 48. Jowett also argues that there was a wrongful conversion of corporate assets when Scruggs declared money to himself as director. Scruggs allegedly usurped corporate opportunity by investing in the tobacco litigation individually and transferred SMLBD assets to himself to do this. There was little evidence to support such claims. Importantly for our review, those claims were dismissed on November 7, 2000, and a Rule 54(b) certification made that there was no reason for delay in entering a final judgment. Jowett did not then appeal, a failure which bars her challenge to those rulings now. Cox v. Howard, Weil, Labouisse, Friedrichs, Inc., 512 So.2d 897, 899-900 (Miss.1987) (later challenge to Rule 54(b) final judgment proper only if the judgment was improvidently granted). No claim of an improvident Rule 54(b) judgment exists here, nor do we find improvidence. The issues of the lost corporate opportunity and conversion are foreclosed.

5. Punitive damages and attorney's fees
¶ 49. Jowett argues that she should have received a greater sum for her shares *648 in SMLBD than Scruggs has offered. She also argues that his breaches of fiduciary duty are so egregious, that they rise to a level deserving punitive damages. We have upheld the finding that there was no breach of a fiduciary duty. There was no basis to award punitive damages.
¶ 50. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANTS.
KING, C.J., BRIDGES, P.J., LEE, IRVING, CHANDLER AND GRIFFIS, JJ., CONCUR. MYERS, J., NOT PARTICIPATING.